**In re SMITHKLINE BECKMAN CORPORATION SECURITIES LITIGATION.**

No. 88–7474.

United States District Court, E.D. Pennsylvania.

Oct. 29, 1990.

Dianne M. Nast, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Richard D. Greenfield, Judith N. Dean, Haverford, Pa., Sherrie R. Savett, Berger & Montague, Philadelphia, Pa., for plaintiffs.

David L. Cohen, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The individual plaintiffs in this consolidated class action seek, pursuant to Federal Rule of Civil Procedure 23, judicial approval of a negotiated settlement agreement in which the defendants agreed to pay class members the sum of $22 million. Plaintiffs' lead counsel have filed a joint petition for reimbursement of expenses and an award of attorneys' fees. As part of the latter application, counsel also request that special awards be conferred upon the class representatives. An appropriately noticed public hearing was held on October 3, 1990. For the reasons that follow, the Court will grant both motions.

### I.

### A.

This litigation consists of eight class action suits instituted under Section 11 of the Securities Act of 1933, 48 Stat. 74, 15 U.S.C. § 77k, Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. §§ 78j(b) & 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. The defendants are SmithKline Beckman Corporation, which is now known as SmithKline Beecham Corporation, members of its Board of Directors, Henry Wendt, George Ebright, and Kenneth Kermes. The Court consolidated the separate lawsuits for pretrial purposes and, over the defendants' opposition, certified as a class all persons (excluding the defendants and their successors, affiliates, and family members) who purchased SmithKline common stock from March 13, 1987 through September 28, 1988.

The plaintiffs alleged in their complaint that the individual defendants, acting in their capacities as officers or directors of SmithKline, made misrepresentations of material fact in the company's 1986, 1987, and 1988 shareholder reports, in its 10–K reports [1] filed with the SEC in 1987, and in various public statements. More precisely, the plaintiffs charged that the defendants fraudulently had fostered the expectation that SmithKline would continue its ten percent rate of annual growth in operating earnings throughout the 1980s. This was ostensibly despite the fact that the market

---

**1.** Section 13 of the Exchange Act, 15 U.S.C. § 78m, mandates that all registered corporations, as defined by Section 12, 15 U.S.C. § 78*l*(g), provide certain information to the SEC. Form 10–K requires a registrant to submit detailed statements describing, among other matters, its financial affairs. *See* 17 C.F.R. § 249.310; Amendments to Annual Report Form, Related Forms, Rules, Regulations and Guides, 45 Fed.Reg. 63,630, 63,640–44.

for the drugs Tagamet and Dyazide, the company's principal sellers, was eroding, that SmithKline lacked any new substantial products which could be introduced in the short term, and that price increases for existing drugs could not generate sufficient revenues to compensate for the market share decline of Tagamet and Dyazide, let alone achieve the anticipated level in corporate growth.

In consequence, the plaintiffs asserted, the market price of SmithKline common stock was artificially inflated from March 13, 1987 until the company's public announcements of June 16, 1988 and September 27, 1988. On June 16th, SmithKline forecasted that its operating earnings for the second and third quarters of 1988 would fall approximately twenty-five percent below 1987 quarterly earnings. The per share price of common stock dropped twenty percent, to $45.75, in response to the company's revelation. According to the plaintiffs, however, this was only a partial disclosure of SmithKline's true financial condition because the defendants continued to misrepresent the nature and expense of its global restructuring plan and had not related the full gravity of the company's market share losses.

On September 27th, the defendants allegedly reported that, as part of its business restructuring strategy, SmithKline would lay off some 1600 employees, close its Philadelphia manufacturing plant, and sell its subsidiaries, for a one-time charge of $300 to $400 million in 1988. The price of the company's common stock declined $3.00 per share. A month later, SmithKline revealed that it would take a pre-tax charge of $398.3 million in the third quarter. This represented a net loss of $195.5 million, which the defendants purportedly blamed on lethargic sales of Tagamet and Dyazide.

After class certification, the plaintiffs embarked on extensive discovery, which lasted for over a year. SmithKline produced several hundred thousand pages of documents. A comparable magnitude of documents were divulged, pursuant to subpoena duces tecum, by non-parties, including Peat Marwick Main & Company and Coopers & Lybrand, which had served as SmithKline's auditors during the relevant period. Plaintiffs' counsel served two sets of interrogatories on all defendants and conducted depositions of nine SmithKline officers and employees. Attorneys for the class also retained experts conversant in accounting and investment banking to assist in their evaluation of discovery materials. The parties began settlement negotiations in October 1989. The defendants requested, and the plaintiffs provided, a comprehensive analysis of evidence supportive of liability to class members. After several months of discussion, the litigants entered into a written Stipulation of Settlement on August 10, 1990.

The Court then approved a notice of hearing on the proposed settlement agreement. The notice related the terms of the Stipulation, indicated that counsel for the plaintiffs would petition the Court for an award of fees comprising up to 30% of the settlement fund, stated that the Court had scheduled a hearing to consider the appropriateness of the Stipulation, and invited class members to file written comments in support of or in opposition to the Stipulation of Settlement. The notice was mailed to all class members known to the parties, and a summary of it was published in *The Wall Street Journal, The New York Times, The Philadelphia Inquirer,* and the *Financial Times.*

### B.

As provided by the Stipulation, the defendants paid into an escrow account $22 million, which, together with interest earned less deductions for attorneys' fees and proper expenses, constitutes the net settlement fund that will be distributed to class members whose claims are approved as valid and timely. Paragraph 10 of the Stipulation enunciates the procedures that class members must follow to become authorized claimants against the net settlement fund. Each class member must submit a proof of claim, along with supporting documentation, to the claims administrator. Claims rejected by the administrator are

subject to review by plaintiffs' lead counsel, and, ultimately, this Court.

A two-step process, which endeavors to tailor the shareholder's recovery to his or her economic injury, regulates allocation of the net settlement fund. First, the amount of an authorized claimant's recognized loss depends on when that individual purchased or sold SmithKline securities. The various formulae set forth in the Stipulation are as follows:

(i)(a) With respect to shares of SmithKline common stock purchased from March 13, 1987 through June 15, 1988, and held after the close of business on June 15, and with respect to shares purchased on June 16, 1988, Recognized Loss is defined as the amount paid for such shares (excluding commission), less the number of such shares multiplied by $44.06, the closing price for SmithKline common stock on September 28, 1988; (b) with respect to shares of SmithKline common stock purchased from June 17, 1988 through September 27, 1988, and held after the close of business on September 27, and with respect to shares purchased on September 28, 1988, Recognized Loss is defined as the amount paid for such shares (excluding commissions), less the number of such shares multiplied by $44.06; and (c) with respect to shares of SmithKline common stock purchased from March 13, 1987 through June 15, 1988 and not held after the close of business on June 15, 1988, and with respect to shares purchased from June 17, 1988, through September 27, 1988, and not held after the close of business on September 27, 1988, Recognized Loss is defined as one-third (33⅓ percent) of the following: the amount paid for such shares (excluding commissions) less the amount realized (net of commissions) from the sale of such shares (based on trade date, not settlement date).

Stip. of Settlement ¶ 9(b). Second, the net settlement fund will be divided by the total

recognized loss of all claimants to arrive at a distribution ratio. Each authorized claimant's share of the net settlement fund is then ascertained by multiplying the distribution ratio by that claimant's recognized loss.

## II.

■ The standard for approval of a proposed class action settlement is well known. The Court must ascertain whether the submitted compromise is "fair, adequate, and reasonable." *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983). The Third Circuit has articulated several factors to guide this inquiry. These include the "complexity, expense and likely duration of the litigation," the reaction of class members to the proffered settlement, "the stage of the proceedings and the amount of discovery completed," the impediments to establishing liability and damages, "the risks of maintaining the class action through the trial," the defendant's ability "to withstand a greater judgment," and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)); *see also Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). The Court finds that the Stipulation of Settlement in this action is fair, adequate, and reasonable.

First, further litigation in this case would present issues that would be costly to resolve, would result in protracted proceedings, and would pose acute risks for all concerned. Section 11 of the Securities Act authorizes any person acquiring a security covered by a registration statement that contains a misrepresentation or omission of material [2] fact to bring suit against individuals who signed the registration statement or served as directors of the issuer. Because this provision was "designed not so

---

**2.** An identified falsehood or omission is material if it pertains to a matter about which "an average prudent investor ought reasonably to be

informed before purchasing" the security. 17 C.F.R. § 230.405(1). *Accord Kubik v. Goldfield*, 479 F.2d 472, 476 n. 8 (3d Cir.1973).

much to compensate the defrauded purchaser as to ... deter negligence by providing a penalty for those who fail in their duties," *Globus v. Law Research Serv.*, 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), a Section 11 plaintiff "need only show a material misstatement or omission to establish [a] prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (footnote omitted).

In contrast, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder forbid the making of untrue or incomplete statements of material fact in connection with the purchase or sale of securities. Unlike Section 11, *see Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1239-40 (3d Cir.1976) (Rosenn, J., concurring); Comment, *Equity Financing for Public Corporations: Reasons and Methods to Encourage It*, 138 U.Pa.L.Rev. 1411, 1440-41 (1990), Section 10(b) and Rule 10b-5 require a showing that the defendant acted with scienter, that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Thus, there must be proof that the defendant either engaged in "intentional or willful conduct designed to deceive or defraud investors," *Dirks v. SEC*, 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983), or departed so extremely from the standards of ordinary care that the defendant's failure to disclose accurate and complete information evinced a reckless disregard for the truth. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989); *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 649 (3d Cir.1980).

"[S]tockholder litigation is notably difficult and notoriously uncertain" even in the best of circumstances. *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y.1973). Although some class members in this action are entitled to sue pursuant to Section 11, most are proceeding under the more demanding standards of Rule 10b-5. Plaintiffs typically have little more than circumstantial and accretive evidence to establish the requisite scienter, *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979), and, as the plaintiffs acknowledge, this case is no exception. According to the defendants, moreover, the goal of ten percent growth was an honest and realistic appraisal of the company's financial fortunes at the time the public statements were disseminated. In support of this contention the defendants allege a number of facts. First, they claim that the investing public was aware that competition from generic products was hampering demand for Tagamet and Dyazide. Second, the defendants had expected price increases, coupled with an aggressive advertising campaign, to compensate for lagging sales. This is assertedly a common revenue-maintenance strategy in the pharmaceutical industry. Third, the defendants state that they reasonably believed profits from the company's foreign divisions would offset any shortfalls from projected goals in the United States. Last, none of the defendants sold SmithKline securities during the class period, which they take to be proof that they were unaware of the company's impending losses. Advancing to trial with this action, then, would require the trier of fact to decide disputed questions about each defendant's mental state at various times by carefully evaluating potentially thousands of documents and the testimony of many witnesses, to no certain end.

■ The determination of whether the classes sustained damages and to what degree would entail additional litigation risks and burdens. The measure of damages in a Section 10(b) action is the out-of-pocket loss suffered by each aggrieved shareholder. Both parties would have to utilize, at great expense, experts to hypothesize what the fair value of the stock would have been in the absence of the claimed fraud. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Austin v. Loftsgaarden*, 675 F.2d 168, 180 (8th Cir. 1982); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 577-78 (2d Cir.), *cert. denied*, 459

U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). Indeed, because the securities of other pharmaceutical companies ostensibly declined in value during the relevant time period, the classes' losses arguably stemmed, in part or in whole, from external market conditions, not the conduct of the defendants. *See Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 49 n. 22 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). "[I]t is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions." *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 744–45 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d Cir.1986). If the plaintiffs were to persuade a jury that the defendants' fraud alone caused their economic injuries, however, the defendants' exposure would be considerable. The plaintiffs' experts have assessed the classes' total damages at $120 million.

Second, the reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy, particularly when the relief is expressed in monetary terms. The Court ordered that class members be notified by mail and publication, and not one has lodged an objection to the settlement's terms. Both the utter absence of objections and the nominal number of shareholders who have exercised their right to opt out of this litigation militate strongly in favor of approval of the settlement.

Third, as explained previously, the plaintiffs secured a voluminous amount discovery material and thoroughly analyzed it. Given that attorneys for the classes already have expended some 11,000 hours in the prosecution of this action, there is little reason to believe that further proceedings would generate new and worthwhile information. Counsel therefore are fully cognizant of the relative merits and deficiencies of their clients' positions. A settlement at this time represents, for both sides, a significant savings of trial and appeals costs.

Although the danger of class decertification at trial appears marginal, the plaintiffs are at risk that classwide relief might not be available. More importantly, realization of the limited prospect of decertification would carry grave consequences. Because the total number of SmithKline shares outstanding at any given time is between 105 and 130 million, many of which may have been held by different persons during the class period, revocation of certification would spawn such a multiplicity of separate suits that the ensuing burden on the legal system is incalculable. Further, absent a class action mechanism, those shareholders who incurred minimal losses effectively would lack legal recourse to vindicate their claims, *see Roper v. Consurve, Inc.,* 578 F.2d 1106, 1114 (5th Cir.1978), *aff'd,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), and all parties would be forced to bear additional administrative costs.

The Court also has considered the defendants' ability to withstand a greater judgment. There is no evidence in the record that SmithKline would be unable to satisfy a larger damages award. The proposed settlement, however, obviates the peril that class members, after undertaking the considerable expense of trial, will obtain an even more sizeable award against the defendants and then discover that they cannot satisfy the judgment.

Last, the Court has evaluated the range of reasonableness of the settlement in light of all the risks associated with litigation. Experienced counsel for both parties, negotiating at arm's-length and possessing all pertinent information, have recommended the present settlement, and their views are entitled to respect. Plaintiffs' reliance on circumstantial and accretive evidence to establish scienter and the inherently speculative nature of losses incurred place severe obstacles to proving both liability and damages. Although an award in excess of the settlement value might be a possibility at trial, the settlement is well within the range of reasonableness identified by the Third Circuit in *Girsh.* In sum, the relative considerations weigh in favor of the

proposed Stipulation of Settlement, and it accordingly will be approved.

### III.

### A.

■■■ The Supreme Court has recognized that a "litigant who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164–66, 59 S.Ct. 777, 779–80, 83 L.Ed. 1184 (1939); *Central R. & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 532–37, 26 L.Ed. 1157 (1882). This common fund doctrine rests on the perception that individuals who profit from a lawsuit "without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co.*, 444 U.S. at 478, 100 S.Ct. at 749. To prevent this inequitable result, a court may assess fees against the entire fund and thereby spread litigation costs proportionately among those whom the suit benefits. *Id.* Similarly, the Third Circuit has noted that in the class action context, attorneys who create a settlement fund are entitled to recover fees against that fund. "The award of fees under the equitable fund doctrine is analogous to an action in quantum meruit; the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy I)*, 487 F.2d 161, 165 (3d Cir.1973); *see also Silberman v. Bogle*, 683 F.2d 62, 64 (3d Cir.1982); *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy II)*, 540 F.2d 102, 110 (3d Cir.1976).

Although it is well established that attorneys' fees may be drawn from a fund in court, there is some controversy regarding the proper method by which the amount of compensation should be calculated. Until 1973, the size of the fee award in both common fund cases and statutory fee shifting cases was left to the court's discretion. "Awards often reflected what the court believed was a 'reasonable percentage' of the amount recovered." *Court Awarded Attorney Fees: Report of the Third Circuit Task Force* (1985), *reprinted in* 108 F.R.D. 237, 242 [hereinafter *Task Force Report*]. Judges at that time utilized a multitude of factors in calculating fee awards and relied most heavily on "the size of the fund or the amount of benefit produced for the class." *Id.* Yet, given the open-ended and contextual nature of the reasonable percentage standard, it often was maligned as investing unlimited discretion in trial judges, producing inconsistent results, and authorizing the collection of windfall profits by attorneys. *Id.* (remarking award percentages varied "considerably from case to case"); *see also Pennsylvania·v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I )*, 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986); Coffee, *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working*, 42 Md.L.Rev. 215, 241–43 (1983); Note, *Determining the Reasonableness of Attorneys' Fees—The Discoverability of Billing Records*, 64 B.U.L.Rev. 241, 243–44 (1984).

Responding to these criticisms, the Third Circuit, in *Lindy I* and *Lindy II*, developed the lodestar method of setting fees. This approach is composed of two steps. First, the court multiplies the hours spent on the case by a reasonable hourly rate of compensation for each attorney involved. Second, the court adjusts that figure to reflect the contingent nature of the litigation, the difficulty of the issues involved, and the quality of the attorney's work. *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583–84 (3d Cir.1984); *Lindy II*, 540 F.2d at 113, 117–18; *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3d Cir.1975); *Lindy I*, 487 F.2d at 167–68. The Supreme Court,

however, reasoning that much of the latter step is subsumed within the former, has curtailed the availability of enhancements to the lodestar. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II)*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098; *see also Rode v. Dellarciprete*, 892 F.2d 1177, 1184 (3d Cir.1990); *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 380 (3d Cir.1987), *later proceeding*, 888 F.2d 975 (3d Cir.1989).

With the advent of *Lindy*, courts soon began applying the lodestar formulation to both equitable fund and statutory fee cases "without any real analysis of the propriety of doing so," *Task Force Report*, 108 F.R.D. at 251, and even though the "public policy considerations in the two situations are not obviously identical." *Fine Paper*, 751 F.2d at 583 n. 19. In particular, "rather than being based on the equitable notion that those who have benefited from litigation should share its costs," *Task Force Report*, 108 F.R.D. at 250, fee shifting provisions are designed to encourage the private enforcement of those substantive rights that " 'Congress considered of the highest importance.' " H.R.Rep. No. 94–1558, at 2 (1976) (quoting *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). But because successful civil rights claims often produce only nominal damages or else declarations of rights, which do not translate easily into pecuniary terms, *id.* at 9; *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978); *Task Force Report*, 108 F.R.D. at 250, fee awards reflecting the reasonable number of hours expended, instead of the amount of money recovered, were thought necessary to induce competent counsel to undertake representation of civil rights plaintiffs. *See, e.g., City of Riverside v. Rivera*, 477 U.S. 561, 577, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986) (plurality opinion) ("[T]he contingent fee arrangements that make legal services available to many victims of personal injuries would often not encourage lawyers to accept civil rights cases, which frequently involve substantial

expenditures of time and effort but produce only small monetary recoveries."); *id.* at 586, 106 S.Ct. at 2700 (Powell, J., concurring); *id.* at 595, 106 S.Ct. at 2704–05 (Rehnquist, J., dissenting); *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir.1982). In contrast, the minimum compensation guaranteed to prevailing plaintiffs' attorneys by the *Lindy* approach is not needed "in the traditional fund case or in those statutory fee cases likely to produce a sizeable fund from which counsel fees could be paid." *Task Force Report*, 108 F.R.D. at 251. *See generally id.* at 250–51, 254–55 (identifying other differences between typical fund-in-court and fee shifting situations). Of course, this Court does not presume to criticize *Lindy* and its progeny. Rather, like the Task Force, *id.* at 250–55, it perceives merely that applying variant fee recovery methods to these two categories of actions will best achieve the differing policy objectives each was designed to further.

Moreover, the Supreme Court not only has distinguished between fund-in-court and statutory fee cases, it also has recognized the propriety of employing the percentage of recovery method in the common fund context. "Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [fee shifting statutes] reflects the amount of attorney time reasonably expended on the litigation." *Blum v. Stenson*, 465 U.S. 886, 901 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984). *Accord* 3 H. Newberg, *Newberg on Class Actions* 186 (2d ed. 1985); *see also Rivera*, 477 U.S. at 574, 106 S.Ct. at 2694 (plurality opinion); *id.* at 586, 106 S.Ct. at 2700 (Powell, J., concurring in judgment); *id.* at 595, 106 S.Ct. at 2704–05 (Rehnquist, J., dissenting). In the wake of *Blum*, several courts have held that the percentage of recovery method is an acceptable basis upon which to calculate fee awards in equitable fund situations. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir.1989) (approving Task Force recommendation that fees be awarded on percentage basis in common

fund cases); *Brown v. Phillips Petroleum,* 838 F.2d 451, 454 (10th Cir.) (holding award of fees on percentage basis in equitable fund situation not per se abuse of discretion), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Bebchick v. Washington Metro. Area Transit,* 805 F.2d 396, 406 (D.C.Cir.1986) (holding in fund-in-court cases reasonable fee based on percentage of fund bestowed on class); *Sala v. National Railroad Passenger Corp.,* 128 F.R.D. 210, 214 (E.D.Pa.1989); *In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 724 F.Supp. 160, 170 (S.D.N.Y.1989); *In re Activision Securities Litigation,* 723 F.Supp. 1373, 1378 (N.D.Cal.1989); *In re TSO Financial Litigation,* Civ. No. 87–7903, slip op., 1989 WL 80316 (E.D.Pa. July 17, 1989); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679 (M.D.Ala.1988); *Howes v. Atkins,* 668 F.Supp. 1021, 1024 (E.D.Ky.1987) (stating "lodestar analysis is usually inappropriate" in common fund context); *Warner Communications,* 618 F.Supp. at 749–50; *Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984–2 Trade Cases (CCH) ¶ 66,234 (N.D.Ill.1984); *see also Task Force Report,* 108 F.R.D. at 255; Coffee, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum.L.Rev. 669, 724–25 (1986); Coffee, *supra,* 42 Md.L.Rev. at 266–68, 285–88. The Court therefore concludes that in equitable fund situations it typically should employ a percentage of recovery approach in setting attorneys' fees. As there are no circumstances suggesting that its application would be unjust, the Court will employ the percentage method in this case.

### B.

■ Because the instant suit involves a straightforward common fund, certain principles guide the disposition of plaintiffs' counsel's motion. First, the district court retains discretion to calculate the fee. *Task Force Report,* 108 F.R.D. at 256. Courts have allowed attorney compensation ranging from 19 to 45% of the settlement fund created, *see TSO Financial Litigation,* slip op. at 14 & appendix; *Warner Communications,* 618 F.Supp. at 749; *Eltman v. Grandma Lee's Inc.,* [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,798 (E.D.N.Y.1986), and one Circuit panel has concluded that the appropriate benchmark for fee awards is 25%. *Graulty,* 886 F.2d at 271; *see also* 3 H. Newberg, *supra,* at 190 (stating normal range of common fund fee awards is between 20 and 30%); Coffee, *supra,* 42 Md.L.Rev. at 239 (indicating typical award is between 20 and 35% of fund). In general, the percentage of recovery fee should "decrease as the size of the fund increases." *Task Force Report,* 108 F.R.D. at 256; *see also* 3 H. Newberg, *supra,* at 190; Hornstein, *Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards,* 69 Harv.L.Rev. 658, 664 (1956). Second, because in the equitable fund context there is "the potential for conflict of interest between the attorneys seeking compensation" and their clients, "the trial court has an independent duty to scrutinize fee applications." *Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985), *vacated,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), *reinstated,* 807 F.2d 49 (3d Cir.1986), *cert. denied,* 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987); *see also In re Fine Paper Antitrust Litigation,* 840 F.2d 188, 195–96 (3d Cir.1988) (citing *Fine Paper,* 751 F.2d at 583). The Court does note, however, that no class member has registered a serious objection to counsel's notice request for fees comprising up to 30% of the settlement fund or to the proposed reimbursement for expenses.[3]

The Court has examined both the fee petition submitted by plaintiffs' counsel and the entire record of this litigation. Based on that review, the Court concludes

---

3. One individual, June H. Norman of Los Angeles, did send an untimely, and obscenity-ridden, diatribe against lawyers, which the Court interprets as an objection to the proposed recovery of fees. Even though the letter was enclosed in a Bear, Stearns & Company envelope, Ms. Norman does not indicate that she has any interest in this suit. Nor does she state what fee she thinks would be reasonable under the circumstances.

that the class members were well served by experienced attorneys who effectively prosecuted a case that presented vexing factual and logistical difficulties, but who nonetheless obtained a highly favorable recovery. Petitioners also brought this action to a close only two years after filing the complaint, despite the problems with which they contended. This is precisely the sort of result that the percentage of recovery fee method is intended to foster and stands as a counterexample to the perennial laments about the slow pace of complex litigation.

Moreover, plaintiffs' counsel terminated this controversy by settlement and thereby avoided burdening the federal judicial system with a trial and appeals. Because "a prompt and efficient attorney who achieves a fair settlement without litigation serves both his client and the interests of justice," *McKenzie Constr. Co. v. Maynard*, 758 F.2d 97, 101–02 (3d Cir.1985), courts and legal commentators sensibly have rejected the view that early settlement necessarily should reduce the amount of the fee award. *See, e.g., Prandini v. National Tea Co.*, 557 F.2d 1015, 1019–20 (3d Cir.1977); *Dorfman v. First Boston Corp.*, 70 F.R.D. 366, 385 (E.D.Pa.1976); *Blank v. Talley Indust.*, 390 F.Supp. 1, 5–6 (S.D.N.Y.1975); Hornstein, *supra*, 69 Harv.L.Rev. at 660–61. Indeed, " 'it would be the height of folly to penalize an efficient attorney for settling a case on the ground that less total hours were expended in the litigation.' " *Sala*, 128 F.R.D. at 215 (quoting *TSO Financial Litigation*, slip op. at 13). The Court is also cognizant of the important social interest in encouraging attorneys to represent individuals with valid claims under the federal securities laws. As Judge Brieant noted in *Union Carbide*, 724 F.Supp. at 169, "A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken."

■ On the other hand, the percentage of recovery fee should decrease as the size of the common fund increases. The employment of a sliding scale not only was recommended by the Third Circuit Task Force, 108 F.R.D. at 256, but also is implicit in many of the decisions in which the percentage method has been applied. *See generally* 3 H. Newberg, *supra*, at 190; Hornstein, *supra*, 69 Harv.L.Rev. at 664. For example, in situations involving funds comparable in magnitude to the one extracted here, courts have awarded percentage of recovery fees comprising 20 to 27% of the fund. *See, e.g., In re Thortec Int'l Securities Litigation*, Civ. No. 88–2470 (N.D.Cal. Aug. 15, 1989) (25% fee from recovery of $19.3 million); *Union Carbide*, 724 F.Supp. at 170 (27% fee from recovery of $20.2 million); *Warner Communications*, 618 F.Supp. at 748 (25% fee from recovery of $18.6 million); *In re Pepsico Securities Litigation*, Civ. No. 82–8403, 1985 WL 44682 (S.D.N.Y. Apr. 26, 1985) (20% fee from recovery of $21.5 million); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 47 F.R.D. 557, 559 (E.D.Pa.1969) (25% fee recovery from recovery of $22.175 million). In light of the foregoing, the Court will grant to the applicants jointly attorneys' fees in the amount of $5,692,250, which constitutes 25% of the total fund of $22,769,000, including the approximate value of interest earned by the settlement fund since May 1, 1990.

■ Plaintiffs' counsel also have moved for reimbursement of $202,460 in aggregate costs incurred between inception of the lawsuit and July 31, 1990. A significant portion of that sum was disbursed to experts and consultants, an expense that clearly is compensable even though the action settled, since their testimony would have been indispensable to the plaintiffs' case had it proceeded to trial. *See, e.g., Roberts v. S.S. Kyriakoula D. Lemos*, 651 F.2d 201, 205–06 (3d Cir.1981). After reviewing the law firms' supporting records and affidavits, the Court finds that the amounts are adequately documented, proper, and reasonable. In consequence, the Court will allow these expenses to be paid from the common fund.

## C.

■ Last, the Court agrees that special awards to the class representatives are appropriate. First, they have rendered a public service by contributing to the vitality of the federal Securities Acts. "Private litigation aids effective enforcement of the securities laws because private plaintiffs prosecute violations that might otherwise go undetected due to the SEC's limited resources." Note, *Private Causes of Action for Option Investors Under SEC Rule 10b–5: A Policy, Doctrinal, and Economic Analysis*, 100 Harv.L.Rev. 1959, 1963 n. 24 (1987). *Accord Berner v. Lazzaro*, 730 F.2d 1319, 1321–23 (9th Cir.1984), *aff'd*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985); *In re M.D.C. Holdings Securities Litigation*, Civ. No. 89–90, slip op. at 10–14 (N.D.Cal. Aug. 30, 1990); *Bleznak v. C.G.S. Scientific Corp.*, 387 F.Supp. 1184, 1189 (E.D.Pa.1974). Second, the named plaintiffs, through their vigilance, have conferred a monetary benefit on a large class of purchasers of SmithKline common stock. The representatives for each plaintiff class therefore will be awarded $5000 from the common fund.

## ORDER AND FINAL JUDGMENT

AND NOW, this 29th day of October, 1990, for the reasons set forth in this Court's Memorandum of October 29, 1990;

IT IS ORDERED that the Stipulation of Settlement dated and filed August 10, 1990 in the above-captioned action, and hereby made a part of this Order, is APPROVED;

AND IT IS FURTHER ORDERED that, this Court having certified this consolidated action as a class action on behalf of a class including all persons who purchased the common stock of SmithKline Beckman Corporation during the period from March 13, 1987, through September 28, 1988, excluding Defendants and certain others and excluding all persons who timely submitted a request to be excluded from the class, pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure, who are not bound by any of the terms of this Order, entry of final judgment and approval of the Stipulation of Settlement shall settle all claims alleged in this action between Plaintiffs and the class on the one hand and defendants on the other;

AND IT IS FURTHER ORDERED that all claims alleged in this action are DISMISSED in their entirety on the merits, with prejudice, and without costs to any party and that all complaints filed in these actions, including Plaintiffs' First and Second Amended Consolidated Complaints, are DISMISSED in their entirety on the merits, with prejudice, and without costs to any party;

AND IT IS FURTHER ORDERED that Plaintiffs and all members of the Class are hereby permanently barred and enjoined from prosecuting in any jurisdiction against any of the released parties, as defined by the Stipulation of Settlement, any and all actions and causes of action, suits or claims of any nature whatsoever, in accordance with the terms of the Stipulation of Settlement;

AND IT IS FURTHER ORDERED that, there being no reason for delay, the Clerk of Court is hereby directed, pursuant to Federal Rule of Civil Procedure 54, to ENTER this Order as a final judgment;

AND IT IS FURTHER ORDERED that plaintiffs' counsel are jointly AWARDED $5,692,250, in attorneys' fees and $202,460 in costs, for a total of $5,894,710 to be paid from the common fund established pursuant to the Stipulation of Settlement approved by this Court;

AND IT IS FURTHER ORDERED that each of the following groups of Class Representatives are AWARDED $5000, plus a proportionate share of the interest earned thereon, to be paid from the common fund established pursuant to the Stipulation of Settlement approved by this Court: (i) Rodney B. Shields, (ii) National Ammonia Company, (iii) Robert H. Shenker Keogh Plan/Robert H. Shenker Profit Sharing Plan, (iv) Harris J. Sklar, (v) William R. and Patricia J. Solvible, (vi) Estate of Irwin Berman, (vii) Ellen Denenberg, (viii) Joseph Liberman, and (ix) Steven and Hallie Goldstein;

AND IT IS FURTHER ORDERED that the balance of the settlement fund, which has a present value of approximately $16,830,000, plus accrued interest less proper administrative expenses, shall be distributed to authorized claimants pursuant to the terms of the approved Stipulation of Settlement and that jurisdiction over all matters relating to the consummation of the Stipulation of Settlement is reserved in this Court.