In re CHAMBERS DEVELOPMENT
SECURITIES LITIGATION.

**This Document Relates to
All Class Actions.**
**MDL–982.**
**Civil Action Nos. 92–0679, 92–1081.**

United States District Court,
W.D. Pennsylvania.

Aug. 18, 1995.

Alfred G. Yates, Jr., Law Offices of Alfred G. Yates, Jr., Pittsburgh, PA, Mark C. Rifkin, Greenfield & Chemicles, Haverford, PA, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiffs.

William M. Wycoff, David G. Ries, Ralph F. Scalera, Craig E. Frischman, Joseph F. McDonough, Manion, McDonough & Lucas, Thorp, Reed & Armstrong, Pittsburgh, PA, for John G. Rangos, Sr., John G. Rangos, Jr., Alexander W. Rangos, Michael Peretto, Rich-

ard A. Knight, Joseph G. Stotlemyer, Hugh Scott, John M. Arthur, William E. Moffett.

Richard R. Nelson, II, Wayne C. Holcombe, Larry K. Elliott, Cohen & Grigsby, Pittsburgh, PA, for Grant Thornton, Richard Stewart, David Abramson, Domenick Esposito, Charles R. Fallon.

Howard A. Specter, George G. Mahfood, Specter Law Offices, Pittsburgh, PA, Arthur N. Abbey, Abbey & Ellis; Marian P. Rosner, Wolf, Popper, Ross, Wolf & Jones, New York City, for Cynthia C. Lovato, Jack Klein, Elizabeth Palazzo.

John W. Thomas, Zimmer Kunz, Pittsburgh, PA, Bruce K. Cohen, Robert M. Wolff, Meredith & Cohen, Philadelphia, PA, for Jeffrey Kaliser.

Kenneth A. Shemin, Rose Law Firm, Little Rock, AR, for Southeast Investments, Inc.

William M. Wycoff, David G. Ries, Ralph F. Scalera, Craig E. Frischman, Thorp, Reed & Armstrong, Pittsburgh, PA, Mark E. Davidson, James J. Markowski, Shea & Gould, Leon P. Gold, New York City, for Chambers Development Company, Inc.

Richard A. Finberg, Malakoff, Doyle & Finberg, Pittsburgh, PA, for Dean M. Panizzi, Dean of Shayside.

## OPINION

LEE, District Judge.

On May 30, 1995, this Court approved the global settlement of this multi-district securities litigation, including the separately-negotiated-but-interconnected settlement of the consolidated shareholders' derivative class action, *Yeager v. Rangos*, Civil Action No. 92–1081. Memorandum Opinion, 912 F.Supp. 822, May 30, 1995 (Document No. 305). ("Mem.Op.") The settlement of the main class action was for approximately $95

million in cash;[1] the Court valued the settlement of the derivative action "in the neighborhood of $4 million dollars." Mem.Op. 912 F.Supp. at 843.

## APPLICATIONS FOR ATTORNEYS' FEES

Before the Court are the application for attorneys' fees filed by Co-lead Counsel ("CLC") in the main class action, Plaintiffs' Verified Joint Petition and Supporting Memorandum for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards ("Main Fee Application") (Documents No. 283, Vol. I, and No. 284, Vol. II), and the application for attorneys' fees filed by derivative plaintiffs' counsel ("DPC"), Memorandum in Support of Plaintiffs' Motion for Final Approval of the Proposed Settlement and in Support of Counsel's Application for Attorneys Fees ("Derivative Fee Application") (Document No. 20 at Civil Action No. 92–1081).[2]

In the main class action, CLC request an award of attorneys' fees pursuant to the percentage-of-recovery ("POR") of a common fund method at 28% of the $95 million settlement fund, or $26.6 million, reimbursement of expenses in the amount of $843,190.22, and incentive awards of $2,500 to each of the representative class members. Additionally, at the hearing on the fairness of settlements, CLC, by agreement of counsel, proposed that they would allocate the attorneys' fees awarded among the numerous counsel who represented plaintiffs in the more than 20 consolidated cases.

■ Attached to the two-volume Main Fee Application are supporting affidavits of participating plaintiffs' attorneys setting forth, with varying degrees of specificity, their firms' respective hourly rates for lawyers and support personnel and the number of hours

---

1. According to counsel, the merger of Chambers Development Co., Inc. and USA Waste Services, Inc., was consummated on June 30, 1995, which now permits precise calculation of the Distribution Fund created according to the terms of the settlement, based upon the formula agreed to by the parties. Letter of Howard A. Spector, plaintiffs' co-lead counsel, July 12, 1995. Accordingly, the main class action settlements "total $94,-983,413.90 exclusive of interest and any amount

that might spill over from the derivative fund." *Id.*

2. The docket and record do not disclose a separate application for attorneys' fees in the derivative action. Therefore, the Court deems the Memorandum in Support of the Derivative Fee Application as the actual application.

each firm worked performing various tasks in various facets of this litigation (not including time spent preparing the fee application) in support of the aggregate "lodestar" figure submitted, $6,365,430.60.[3] These lodestar figures and supporting affidavits were submitted as a "cross-check" on the reasonableness of the POR fee request.

In the Derivative Fee Application, DPC seek an award of

approximately 2.2 million, out of a total monetary settlement of ... between $9,385,000 to $10,865,000). This gross fee includes expenses incurred by counsel for the derivative plaintiffs in the amount of approximately $15,000 [plus, apparently, the request for counsel fees not to exceed $1,975,000 from the Chambers' officers and directors and counsel fees of $200,000 agreed to by Grant Thornton.] Therefore, the counsel's fee sought by counsel is about 23% of the total monetary settlement, assuming evaluation of the real property at the lower end.

Derivative Fee Application at 23.

The Derivative Action Stipulation and Settlement Agreement (Document No. 13 at Civil Action No. 92–1081) filed on February 24, 1995, contains the proviso that "Plaintiffs' counsel in the Derivative Litigation have agreed to request the Court to award them attorneys' fees of One Million Nine Hundred Seventy-five Thousand Dollars ($1,975,000), plus reimbursement of all reasonable costs incurred ... together with interest ... as may be approved by the Court. Chambers agrees to pay such amounts, as may be approved by the Court, not to exceed One Million Nine Hundred Seventy-five Thousand ·Dollars ($1,975,000) ... and the individual defendants will take no position with respect

to such payment." *Id.* at ¶ 7. Moreover, the stipulation of settlement in the derivative action specifically makes it "a condition of this settlement that the settlement of the Securities [Main] Class Action, set forth in a separate Stipulation and Agreement of Compromise and Settlement, be fully consummated." *Id.* at ¶ 11.

As this Court stated in its memorandum opinion of May 30, 1995, the settlement of the main class action includes a "recapture provision" which states that "[i]n the event the Court disapproves any portion of the requested award of One Million Nine Hundred and Seventy-five Thousand Dollars ($1,975,-000), plus interest, for fees and reimbursement of expenses in the Derivative Action ..., then the portion not approved shall be paid over into the Settlement Fund in this [main class] action. Mem.Op. 912 F.Supp. at 847, *quoting* Supplement to Class Action Stipulation and Agreement of Compromise and Settlement (Document No. 266) at ¶ 7 (filed March 21, 1995).

DPC did not submit lodestar data prior to the fairness hearing, apparently in reliance upon their erroneous assumption "that this Court plans to apply the percentage method to awarding counsel fees...." Derivative Fee Application at 22.[4] At the Court's direction, DPC subsequently submitted lodestar data, with supporting affidavits, on May 26, 1995. Joint Declaration of Fred Taylor Isquith and C. Oliver Burt, III, in Support of Application to Approve Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Derivative Declaration") (Document No. 26 at Civil Action No. 92–1081).

Backed by the separate affidavits of representatives of the law firms which represented the plaintiffs in the federal derivative action

---

**3.** The "lodestar" is the calculation of fees "by multiplying the number of hours expended by some hourly rate appropriate for the region and for the experience of the lawyer." *In Re General Motors Corp. Pick–Up Truck Fuel Tank Lit.*, ("*GMC Fuel Tank Lit.*"), 55 F.3d 768, 819 n. 37 (3d Cir.1995). The "lodestar" method is that endorsed by the Court of Appeals for the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) ("Lindy I"), *appeal following remand*, 540 F.2d 102 (3d Cir.1976) ("Lindy II").

**4.** CPC in the main class action recall "the court remarked at a status conference that a fee based

upon a percentage of any fund created would be appropriate." Main Fee Application at 5. Obviously, any such passing remark at a status conference could not be construed to be a ruling on the issue of the appropriate method of determining a reasonable fee, and CLC in the main class action obviously did not make such an assumption, as evidenced by their extensive, well-researched and briefed memorandum on the issue of the proper method of calculating attorneys' fees, with supporting lodestar data simultaneously offered as a "cross-check" on the reasonableness of any fee calculated via the POR method.

and in related state court derivative proceedings, the "bottomline" lodestar figure for the derivative action is "$747,989.25 ... expended in the prosecution of this litigation by the firms in this federal action as well as the five other firms in the State Court Actions. A total of $48,140.81 expenses were incurred." Joint Derivative Declaration at ¶ 12. Moreover, DPC submit that their fee and expense reimbursement request ($2.175 million; *id.* at ¶¶ 2, 14) amount to "between 23% and 42% of the value of the consideration received by Chambers Development...." *Id.* at ¶ 13. It is unclear where the 42% figure comes from,[5] but a 23% POR equaling $2.175 million would represent a settlement in the vicinity of $9.5 million, which is the vicinity of the value DPC placed on the derivative settlement at the time of the fairness hearing. Memorandum in Support of Plaintiffs' Motion for Final Approval of the Proposed Settlement and in Support of Counsel's Application for Attorneys Fees (Document No. 20 at Civil Action No. 92–1081) at 18. (The DPC's most recent opinion of the settlement value is "approximately $9,612,000," which would place the $2.175 million fee expense reimbursement application at about 22.6% under a POR approach. Derivative Plaintiffs' Memorandum of Law in Support of Their Motion for Modification, or, in the Alternative, for Reargument, Reconsideration and/or Clarification of the Court's May 30, 1995 Order (Document No. 29 at Civil Action No. 92–1081) at 1, 8.)

The Joint Derivative Declaration reiterates that the derivative action settlement was "part of a global settlement with the class action" and that, indeed, the "settlement agreements ... are *interlocked* and *interrelated.*" Joint Derivative Declaration at ¶¶ 2 and 7 (emphasis added).

## DERIVATIVE PLAINTIFFS' MOTION FOR MODIFICATION, OR, IN THE ALTERNATIVE, FOR REARGUMENT, RECONSIDERATION AND/OR CLARIFICATION OF THE COURT'S MAY 30, 1995 ORDER

In a most interesting and unexpected development, on June 13, 1995, DPC filed the above-referenced Motion for Modification, or, in the Alternative, For Reargument, Reconsideration and/or Clarification of the Court's May 30, 1995 Order, along with a supporting memorandum of law. This "Motion for Modification" was filed *explicitly* "pursuant to Rule 59 of the Federal Rules of Civil Procedure." *Id.* at 1.

The Rule 59 Motion for Modification was unexpected because *all* counsel and the Court were keenly aware that time was of the essence because the "merger with U.S.A. Waste [was] on a tight time table," and that the planned merger upon which the global settlement depended was "contingent upon the Court's approval of the settlement *and the uneventful passage of the [30 day] appeal period.*" Mem.Op. 912 F.Supp. at 839; *see also* notes of testimony, July 19, 1995, Fairness Hearing at, *e.g.,* 54–55. In light of the extremely narrow window of opportunity which *all* counsel including DPC, were well aware of and made the Court well aware of in open court at the hearing on *preliminary* approval of the settlements and the final fairness hearing and otherwise, and in light of the potentially *disastrous jeopardy* in which the settlement and the merger would be placed if the appeal period were disrupted for any reason, it was, and is, inexplicable that DPC filed their "Rule 59" Motion for Modification knowing, as any experienced practitioner *must* be expected to know, that filing such a motion would *extend the appeal period* under the plain and unambiguous language of the Federal Rules of Appellate Procedure. Fed.R.A.P. Rule 4 provides, in relevant part:

### Appeal as of Right—When Taken

**(a) Appeal in a Civil Case.**

(1) Except as provided in paragraph (a)(4) of this Rule, in a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 must be filed with the clerk of the district

---

**5.** A fee percentage of 42% based on a fee of $2.175 million would represent a settlement value of approximately $5.2 million.

court within 30 days after the date of entry of the judgment or order appealed from; . . .

.    .    .    .    .

(4) *If any party makes a timely motion of a type specified immediately below, the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding.* This provision applies to a timely motion under the Federal Rules of Civil Procedure:

.    .    .    .    .

**(B)** *to amend or make additional findings of fact* under Rule 52(b), *whether or not granting the motion .would alter the judgment;*

**(C)** *to alter or amend the judgment* under Rule 59;

.    .    .    .    .

**(E)** for a new trial under Rule 59. . . .

F.R.A.P. Rule 4(a)(1) and (a)(4)(B, C and E) (emphasis added).

It is clear from DPC's Motion for Modification and supporting memorandum of law, and from subsequent documents, that DPC sought no real "relief" from the Court's judgment *approving* the derivative action settlement and that in the main class action, but rather, sought *only* collateral reconsideration of certain facts found by the Court, namely the valuation of the derivative settlement at $4 million, and correction of this Court's "erroneous[ ] assum[ption] that any portion of the cash settlement sum not paid as a fee to Plaintiffs' Derivative Counsel would go to the class." Motion for Modification at ¶¶ 1, 2. The parties agree that the *ostensible* purpose of DPC's Rule 59 Motion for Modification was "to request the Court to consider the proper valuation of the derivative settlement in connection with their application for attorneys' fees," on the erroneous assumption that the Court would award DPC attorneys' fees based on a percentage of the value of the settlement. Stipulation Concerning Derivative Plaintiffs' Motion for Reargument/Reconsideration (Document No. 35) at ¶ 4 (stipulation of counsel for all parties in the derivative action). The Court will not speculate what DPC's subjective *strategic*

purpose in filing this motion as a Rule 59 motion might have been, although some ominous implications arise.

With regard to the "recapture" provision of the main class action settlement, which was made a part of the comprehensive, integrated global settlement package no later than March 21, 1995, *see* Supplement to Class Action Stipulation filed March 21, 1995 (Document No. 266 at ¶ 7, and exhibits and revised exhibits thereto), DPC state in their Motion for Modification filed June 13, 1995:

> Neither the Derivative Settlement Stipulation with Chambers and its Directors and Officers *nor the* Class Action Settlement Stipulation provides for any such payment to the Class. . . .

Motion for Modification at ¶ 2. Moreover, in their memorandum of law in support, DPC unequivocally state:

> Several times the Court mentions in its Memorandum Opinion that all portions of the cash not allocated to the fee would go to the class for the benefit of the securities class plaintiffs. *That is simply inaccurate.* The Settlement Stipulation with Chambers and its Officers and Directors does *not* provide for any reversionary interest to the class, although the Settlement Stipulation with Grant Thornton does provide for a reversionary interest to the Class in the $200,000 payment from Grant Thornton. That amount is in total .22 percent of the global settlement.

Memorandum of law at 9, n. 8 (emphasis in DPC's original).

DPC submitted the Declaration of C. Oliver Burt, III, Pursuant to 28 U.S.C. § 1746 (Document No. 39 at Civil Action 92–1081) to "*clarify our understanding* concerning the so-called 'recapture' provision referred to in the Court's May 30 Opinion." ¶ 1. (Emphasis supplied by the Court). This "clarification" of DPC's "understanding" of the recapture provision claims that DPC "were unaware of the existence of that 'recapture' provision and learned about it *only after submitting* their Motion for Reargument/Reconsideration of the Court's May 30 Order." ¶ 2. This is hard to fathom—the Court's May 30th opinion itself should have been a tip-off to the existence of such a

provision; the *first* tip-off should have been the Supplement to Stipulation of Settlement, filed on March 21, 1995, in the main class action.

Similarly, it is hard to imagine how DPC could legitimately argue that they "do not consider the 'recapture' provision to be part of the derivative settlement." Burt Declaration at ¶ 2. What makes this legal conclusion so insupportable is that, as shown in the references above to several documents filed in this case, and previous statements by Messrs. Isquith and Burt, the global settlements and negotiations in this litigation, *including* the derivative action, were "interlocked and interrelated." Joint Declaration at ¶ 7. *See* Derivative Action Stipulation (Document No. 13 at Civil Action No. 92–1081) at ¶ 11 (It is "a condition of this [derivative] settlement that the settlement of the [main class action] ... *be fully consummated.*") As this Court previously has observed, "each settlement [was] contingent on the Court's approval of the other, and each [was] inextricably intertwined with the other." Mem.Op. 912 F.Supp. at 841.

DPC's "Rule 59" Motion for Modification sent a few shock waves of its own among all counsel in this litigation, and this Court ordered responses from counsel who understandably scrambled to save the merger and the settlement. "Damage Control" was taken in an attempt to limit the impact of the Motion for Modification on the appeal period by way of a Stipulation Concerning Derivative Plaintiffs' Motion for Reargument/Reconsideration (Document No. 35 at Civil Action No. 92–1081) signed by counsel for all parties in the derivative action. This Stipulation "retrofits" the Rule 59 motion in the following manner: (i) "the reference to Rule 59 is stricken *ab initio*" because the motion did not seek relief from the Court's order but rather sought reconsideration of "certain issues ... collateral to approval of the derivative settlement," namely valuation of the settlement, ¶ 1; (ii) "To the extent that the Motion is deemed to have been brought under Rule 59 or any other such rule which provides for the suspension of the time for appeal from the Final order and Judgment entered in the Derivative Action on May 30, 1995, it is not so based...." ¶ 2; (iii) "the parties agree that the Motion should not be treated as one which suspends the time for appeal under Rule 4(a) of the Federal Rule of Appellate Procedure." ¶ 3. (Whether Damage Control was successful is not before the Court and is not this Court's call in any event; therefore, the Court expresses no opinion on the efficacy of this Stipulation to accomplish its intended purpose of restoring the original 30–day appeal period.)

## METHOD OF CALCULATING ATTORNEYS' FEES IN CLASS ACTION COMMON FUND CASES

The latest edition of the Manual for Complex Litigation (Third) ("MCL III") prefaces its chapter on Attorneys' Fees with this understatement:

> Much complex litigation ... arises under statutes or common law rules that require the court to determine the amount of fees, as well as expenses, to be paid to attorneys. *The rules that govern the award of attorneys' fees and expenses are not always clear and settled,* and involve a large measure of discretion.

MCL III, § 24.1 (emphasis added).

The sheer volume of published opinions spawned by disputes over attorneys' fees is remarkable, especially in light of the Supreme Court's oft-quoted words of caution that "A request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). The complexity of the subject is evidenced by the volumes of critical analysis, academic and judicial, and by the variety and creativity of approaches, spins and nuances that have developed in the courts. However, "neither [the] warning nor the attempted clarification of the law in *Hensley* and in subsequent Supreme Court decisions has significantly reduced the burden or complexity of fee awards." *Awarding Attorneys' Fees and Managing Fee Litigation,* ("Awarding Attorneys' Fees") Federal Judicial Center (1994), at 2.

There is no need to replow the fertile field of attorneys' fee litigation or trace the

evolution of judicial mechanisms for arriving at an appropriate and reasonable fee in those cases where it becomes the court's responsibility to set or award the fee.[6] Suffice it to say that the present securities case is a class action, common-fund [7] case, and that, whatever doubts there may have been in the Third Circuit regarding the appropriate method of calculating attorneys' fees in such cases, *i.e.*, whether to use lodestar or POR, recently have been laid to rest in *In re General Motors Corp. Pick-Up Truck Fuel Tank Lit.*, ("*GMC Fuel Tank Lit.*"), 55 F.3d 768 (3d Cir.1995).

Speaking for the panel, Judge Becker concluded: "In common fund cases, a district judge can award attorneys' fees as a percentage of the fund recovered. · *See Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984); *In re SmithKline Beckman Corp. Sec. Lit.*, 751 F.Supp. 525 (E.D.Pa.1990)." *GMC Fuel Tank Lit.*, 55 F.3d at 822.[8] Moreover, the Court of Appeals for the Third Circuit aligned this circuit with those that permit the

district court to exercise its discretion in choosing *either* the POR *or* the lodestar method, *or* some combination or hybrid, as the circumstances warrant, rather than with those Circuits which *require* the POR method in such cases. The Court of Appeals stated:

> Because the district court purported to use both the lodestar and the percentage-of-recovery methods, the actual grounds for its approval of the fee are not entirely clear. Although it is sensible for a court to use a second method of fee approval to cross check its conclusion under the first method, we believe that *each method has distinct advantages for certain kinds of actions, which will make one of the methods more appropriate as a primary basis for determining the fee.* Here, for the reasons that follow, the court should probably use the percentage-of-recovery rather than the lodestar method as the primary determinant, *although the ultimate choice of methodology will rest within the district court's sound discretion.*

---

**6.** A good starting point would have to be the Report of the Third Circuit Task Force, October 8, 1985, on *Court Awarded Attorney Fees* ("Task Force"), 108 F.R.D. 237–274 (1985); the *Manual for Complex Litigation*, (Third), Federal Judicial Center (1995), § 24.1; and Herbert Newberg & Alba Conte, *Newberg on Class Actions* ("Newberg"), Ch. 14, Attorneys' Fees in Class Actions (3d ed. 1992). A complete list of recommended and helpful judicial opinions on the subject is unnecessary and would make a string citation too lengthy for our purposes, but the reader is directed to a few of the recent expositions. *See, e.g., In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Lit.*, 56 F.3d 295 (1st Cir.1995); *GMC*, 55 F.3d at 819–22; *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C.Cir. 1993); *In the Matter of Continental Illinois Sec. Lit.*, 962 F.2d 566 (7th Cir.1992); *In Re Unisys Corp. Retiree Med. Benefits ERISA Lit.*, 886 F.Supp. 445 (E.D.Pa.1995). (Cahn, C.J.'s lengthy and erudite opinion detailing the American and the Third Circuit evolution in attorneys' fees litigation, and pretty much exhausting the field on the subject.)

**7.** "The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees. *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir.

1977)." *GMC Fuel Tank Lit.*, 55 F.3d at 820 n. 39.

**8.** District courts within the Third Circuit have been divided on whether our Court of Appeals had adopted the use of the POR method in common fund cases as recommended unequivocally by its Task Force or, indeed, whether the district courts remained bound by *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161· (3d Cir.1973) ("Lindy I"), which required the application of the lodestar method in a common fund attorneys' fee case. *See Unisys*, 886 F.Supp. at 458–60 (collecting cases and aligning with those courts adopting POR method in common fund cases). *GMC Fuel Tank Lit.* now authorizes use of the POR approach in common fund class action cases, and, this Court believes, its reliance on *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984), obviates any problem that might otherwise have prevented one panel of the Court of Appeals for the Third Circuit (the *GMC Fuel Tank Lit.* panel) from attempting to overrule another. *See Public Interest Research Group of New Jersey v. Windall*, 51 F.3d 1179, 1186 n. 9 (3d Cir.1995) (on the proper method of calculating the "relevant market" to set the hourly rate to be used for the lodestar in statutory fee-shifting cases, the Court of Appeals stated: "Neither a task force report nor a subsequent panel can overrule a published opinion of this Court. *See* I.O.P. 9.1 (only the Court sitting in banc may overrule an earlier published opinion of this Court.").

The lodestar and the percentage of recovery methods each have distinct attributes suiting them to particular types of cases. *See Task Force*, 108 F.R.D. at 250–53. Ordinarily, a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees (thought there is, as we have noted, an advantage to using the alternative method to double check the fee).[40]

40. For example, a court can use the lodestar method to confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate; similarly, the percentage of recovery method can be used to assure that counsel's fee does not dwarf class recovery.

Courts generally regard the lodestar method, which uses the number of hours reasonably expended as its starting point, as the appropriate method in statutory fee shifting cases . . . .

. . . . .

Courts use the percentage of recovery method in common fund cases on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class. *See Task Force*, 108 F.R.D. at 250 . . . .

*Id.* at 55 F.3d 820–21 (emphasis added).[9]

### A. Main Class Action.

■ The main class action has produced a classic "common fund" of $95 million and is the "paradigmatic common fund" case. *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Lit. ("Hotel Fire Lit.")*, 56 F.3d 295, 310 (1st Cir.1995). Without question, the settlement achieved in this litigation warrants the application of the POR method for calculating reasonable attorneys' fees. *See, e.g., In the Matter of Continental Illinois Sec. Lit.*, 962 F.2d 566 (7th Cir.1992); *In re U.S. Bioscience Sec. Lit.*, 155 F.R.D. 116, 118 (E.D.Pa.1994); *In re*

9. The Courts of Appeals for the Eleventh and for the District of Columbia Circuits require their district courts to use the POR method in common fund cases, while those of the First, Sixth, Seventh, Ninth and Tenth Circuits "allow the use of either the lodestar approach or the percentage

*SmithKline Beckman Corp. Sec. Lit.*, 751 F.Supp. 525, 533 (E.D.Pa.1990), *cited with approval* in *GMC Fuel Tank Lit.*, 55 F.3d at 822.

■ The more difficult question is "what percentage of recovery" is reasonable? As my colleague from the Eastern District of Pennsylvania, Chief Judge Cahn, has observed, "there is no consensus on how to determine a reasonable percentage. *See Brown [v. Phillips Petroleum Co.*, 838 F.2d 451] at 454 [ (10th Cir.1988), *cert. denied*, 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ]." *UNISYS*, 886 F.Supp. at 460. Although there is yet no consensus on the issue, it is not for lack of trying, and federal courts have been most creative, employing a variety of techniques to determine the reasonable percentage in a given case with "reference to all the circumstances of the case, including the size of the fund" so as to avoid simply "picking a number out of the air." *In re Washington Public Power Supply System Securities Lit.*, 19 F.3d 1291, 1297 (9th Cir. 1994).

Chief Judge Cahn thoroughly reviewed these various techniques, including appointment of special masters to determine, after-the-fact, what fee percentage would have been negotiated at the outset at arm's length in a commercial setting; straight, across-the-board percentages; various hybrid percentage-blended-with-lodestar methods; comparisons of POR fees in similar cases; the use of "benchmark" percentages, from which the district court can make upward or downward adjustments; and, sliding scale or declining percentages which decrease as the size of the fund increases. *Unisys*, 886 F.Supp. at 460–68. This Court has carefully considered the many variations on the POR theme and concludes, contrary to the conclusion reached by Chief Judge Cahn (whose hybrid method in the *Unisys* case produced a POR fee of approximately 6.5% of an $111 million settlement), that the most efficient, fair and reasonable method of calculating the appropri-

approach." *UNISYS*, 886 F.Supp. at 459 (collecting cases). Chief Judge Cahn suggests that the "Court of Appeals for the Fifth Circuit appears to be staying with the lodestar approach." *Id.*, 886 F.Supp. at 459 n. 25 (citations omitted).

ate percentage in this case is to use the declining fee scale which decreases as the common fund increases. The Third Circuit Task Force on Court Awarded Attorney Fees recommends this sliding scale approach, stating (albeit in the context of a negotiated fee), that in "most instances, [arriving at the proper percentage] will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, *absent unusual circumstances, the percentage will decrease as the size of the fund increases.* In a case in which a large settlement is anticipated, the negotiated contingency range may include relatively small percentages.... 63. For example, the *Agent Orange [In re "Agent Orange" Product Liability Lit.,* 611 F.Supp. 1296 (E.D.N.Y.1985) ] plaintiffs' lawyers collected over ten million dollars in fees, yet that amounted to less than 6% of the settlement fund." Task Force, 108 F.R.D. at 256 and 256 n. 63.

So too, the latest incarnation of the Manual for Complex Litigation appears to advocate the sliding fee scale approach, at least where the fund is quite large, as it is in this litigation. "Where the fund is unusually large, however, the application of a benchmark percentage ... may result in a windfall to counsel. Some courts have therefore used a sliding scale, with the percentage decreasing as the magnitude of the fund increased, or have used the lodestar method." MCL III at 189 (footnotes omitted). Newberg and Conte also advocate the sliding scale percentage feature for large common fund recoveries, stating:

> In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 30 per cent range. This fee percentage would often be higher on a proportional basis for modest recoveries because of the larger ratio of hours to recovery amount that would likely be involved. On the other hand, *the fee percentage would be significantly more modest as the common fund recovery begins to reach recoveries approaching or exceeding $100 million,* based on the notion that the effort necessary to achieve recovery dollars at the high end was less onerous, on a sliding scale, than the effort expended for recovering the threshold sums by judgment or settlement.

*Newberg,* § 14.03, at 14–13–14–14 (emphasis added).

A comparison of cases in which the common fund was between $100 and $200 million discloses fees in a POR range of 4%–10%. *Unisys,* 886 F.Supp. at 462, and 462 n. 33. Another comparative reflection of the "going market" rates in large securities class action settlements is the rates requested by plaintiffs' attorneys in such cases. *See e.g., Unisys* (7.5% requested on settlement of $111 million); *Continental Illinois Sec. Lit.* (20% cap agreed to on settlement of $45 million).

In the vanguard of the sliding scale approach are several cases in other districts in the Third Circuit from which this Court draws much guidance. *See, e.g., In Re Greenwich Pharm. Sec. Lit.,* 1995 WL 251293, 1995 U.S. Dist. LEXIS 5717 (E.D.Pa. 1995) (Newcomer, J.; on settlement of $4.375 million, court approves fee of 33 percent as appropriate, but endorses sliding scale approach for larger funds, stating: "In general, to avoid windfalls, the percentage of recovery fee decreases as the size of the fund increases. Third Circuit Task Force Report, 108 F.R.D. at 242.... Therefore, in many class actions with immense settlement funds, the attorneys' fee awards, while high in absolute terms, are often lower than 25 percent of the fund.... In this [much smaller] case, a fee award of 33 percent does not present the danger of providing plaintiffs' counsel with the windfall that would accompany a 'megafund' of, for example $100 million."); *In re First Fidelity Bancorporation Sec. Lit.,* 750 F.Supp. 160 (D.N.J.1990) (Sarokin, J.; on settlement of $30.9 million, the court adopts the sliding scale POR method, and determines the reasonable declining fee to be 30% of the first $10 million, 20% of the next $10 million, and 10% of all monies in excess of $20 million); *Sala v. Nat'l R.R. Passenger Corp.,* 128 F.R.D. 210 (E.D.Pa.1989) (Broderick, J. on settlement of $1.79 million, Court awards 33% fee on first million and 30% of the remainder).

In *SmithKline,* Judge Broderick observed that "the percentage of recovery fee should

decrease as the size of the common fund increases. The employment of a sliding scale not only was recommended by the Third Circuit Task Force ... but also is implicit in many of the decisions in which the percentage method has been applied." 751 F.Supp. at 534 (citations omitted). *SmithKline* was approved, generally, by the Court of Appeals for the Third Circuit in *GMC Fuel Tank Lit.*, 55 F.3d at 822. Judge Posner of the Court of Appeals for the Seventh Circuit also has observed that the sliding fee scale arrangement might be expected in major commercial litigation: "we also know that in large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered—it might be 33% of the first million, 25 percent of the next million, and so on down." *Continental Illinois Sec. Lit.*, 962 F.2d at 572.

As the Manual for Complex Litigation (Third) instructs:

An award of attorneys' fees in a common fund case is committed to the sound discretion of the trial court, considering the unique factors in the case. The court awarding such a fee should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable. The factors used in making the award will vary, but may include one or more of the following:

- the size of the fund created and the number of persons benefited;
- the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
- the skill and efficiency of the attorneys involved;
- the complexity and duration of the litigation;
- the risk of nonpayment;
- the amount of time devoted to the case by plaintiffs' counsel; and
- the awards in similar cases.

MCL III, § 24.121 at 190–91.

The Court carefully has reviewed this case and CLC's application for a POR of 28% of the $95 million "megafund" settlement in light of the foregoing legal analyses and the factors identified in the Manual for Complex Litigation (Third), remaining mindful of the Court's *primary fiduciary obligation* to all members of the class to thoroughly scrutinize attorneys' fees applications to award a reasonable fee that will amply compensate successful counsel for a job well done and encourage continued vigilance by the bar, without providing a windfall to a few (counsel) at the expense of the many (the class). *See GMC Fuel Tank Lit.*, 55 F.3d at 819–20. Viewed in that light, the Court adopts the declining POR method of calculating the reasonable attorneys' fees in the main class action.

The Court accepts the "benchmark" 30% figure as a starting point, *U.S. Bioscience Sec. Lit.*, 155 F.R.D. at 119–20, based upon this Court's intimate knowledge of this case and a comparison of cases involving large settlements, and the other factors identified by the Manual for Complex Litigation (Third), the Court determines that the reasonable sliding fee scale in this case is:

| | |
|---|---|
| $ 0-$10 million @ 30% = | $ 3.0 million |
| $10-$20 million @ 25% = | $ 2.5 million |
| $20-$95 million @ 20% = | $15.0 million |
| Aggregate Percentage @ 21.6% =    Total = | $20.5 million |

As a "cross-check," the total lodestar "bottomline" submitted by CLC is approximately $6.365 million. Thus, an award of attorneys fees of $20.5 million is approximately 3.2 times the aggregate lodestar, a figure which certainly is reasonable, considering the skill and efficiency of the attorneys involved, the risk of nonpayment and the complexity and duration of the litigation, but does not represent a windfall nor does it appropriate a disproportionate share of the recovery brought about through the combined efforts of plaintiffs' counsel.

*Allocation of Counsel Fees*

The issue of allocation of counsel fees is acrimonious in some cases, *see Hotel Fire*

*Lit.,* but this one so far has been harmonious. Accordingly, this Court will permit the CLC in the main class action to proceed with the allocation of the $20.5 million attorneys' fees in the first instance, but will provide an appropriate mechanism in the accompanying order for resolving any disputes that may arise.

### Expenses

■ Plaintiffs' counsel also are entitled to be reimbursed for all reasonable expenses necessary for the successful prosecution of this litigation. *See e.g., Danny Kresky Enterprises Corp. v. Magid,* 716 F.2d 215, 219–20 (3d Cir.1983); *SmithKline,* 751 F.Supp. at 534. CLC allege they have "incurred reasonable and necessary expenses of $843,190.22" and have submitted summaries of the "breakdown of the aggregate expenses by category ... in the respective affidavits of plaintiffs' counsel...." Main Fee Application at 29.

■ By far, the largest single category of expense included in the summaries is nearly half a million dollars for "experts and consultants." *E.g.* Main Fee Application, Appendix 2 at ¶ 8 and Appendix 3 at 2. Clearly, expert and consultant fees may be entirely reasonable, necessary, and therefore reimbursable, expenses. *See, e.g., Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201, 205–06 (3d Cir.1981). Although the Court certainly does not doubt that counsel in good faith considered the expert and consultant fee items of expense to be reasonable and necessary, the court is reluctant to approve such hefty expenses without closely reviewing, or having a special master in the first instance closely review, the application for reimbursement of expenses. Accordingly, the Court will refer the matter of reimbursement of expenses to main class action plaintiffs' counsel to Special Master John J. McLean, Jr., for preparation of a report and recommendation pursuant to Fed.R.Civ.P. Rule 53. CLC are advised to submit to Special Master McLean any documentation they deem appropriate to support at least their major items of expense, including the expert and consultant fees, as well as any documentation Special Master McLean may specifically request.

### Incentive Awards to Class Representatives

■ The practice of awarding incentives to the representatives of the class for the additional risk and inconvenience they take in joining the lawsuit as named parties is not universally endorsed. *Compare Greenwich Pharm. Sec. Lit.* (approving incentive awards of $5,000 to each class representative) and *SmithKline,* (same), *with Continental Illinois Sec. Lit.* (disapproving and vacating incentive awards to class representatives) *and U.S. Bioscience Sec. Lit.* (same except for reimbursement for any costs and $40.00 *per diem*). Nevertheless, it has been this Court's practice to approve such incentive awards if they are reasonable, *Hartings v. American Express Co.,* Civil Action No. 88–744, 1994 WL 881843 (W.D.Pa.1994) (approving $2,500 incentive enhancements to class representatives), as the Court finds the $2,500 incentive awards requested in this case to be. The Court will follow its practice and award the incentive fees requested.

## B. The Derivative Action

"Not all class actions are common fund cases," *Awarding Attorneys' Fees* at 49, nor are all securities cases common fund cases. *See Christensen v. Kiewit–Murdock Inv. Corp,* 815 F.2d 206, 211 (2d Cir.1987). The settlement of the derivative class action has not produced a true common fund, but rather "presents a situation more closely aligned with the ... statutory fee paradigm" where the lodestar method will usually carry the day. *GMC Fuel Tank Lit.,* 55 F.3d at 821. As this Court previously has reviewed and analyzed the derivative action, it is not a typical "class action" because any recovery goes to the corporation, Chambers Development, as the real party-in-interest, and the settlement of the derivative action has produced no "common fund" of cash or liquid assets for the corporation because any cash Chambers does not hand over to DPC will be immediately recaptured by and dispersed in the Distribution Fund in the main class action according to the terms of the global settlement package.

■ The only measurable value to the corporation of the derivative action settlement is

the value of the real estate and headquarters office building to be transferred from Synergy Associations/John G. Rangos, Sr., to Chambers. The Court placed that value, generously,[10] at $4 million. Nothing in DPC's "Rule 59" Motion for Modification convinces this Court that the value should have been placed at some higher figure, *certainly* not the belated affidavit of an "accounting and valuation expert retained by" DPC to prepare and submit a report on valuation to this Court *only after* the fairness hearing had been conducted and the dust had settled on this Court's order approving the global settlements.

Accordingly, the Court will deny DPC's Motion for Modification as being *wholly* without merit, although not wholly without value; the value of the Motion for Modification is that it illustrates how *subjective* the issue of valuation of the derivative settlement is, and how *unsusceptible* that settlement is, therefore, to an award of attorneys' fees based on a percentage of a "fund" which does not really exist and, if it does, is valued at *somewhere* between $2 and $9.6 million (but *much* closer to the lower end).

The Court finds, therefore, that the POR method of calculating DPC's attorneys' fees would be totally inappropriate because hopelessly imprecise; to the contrary, calculation of attorneys' fees for DPC via the lodestar method has the "benefit of avoiding subjective evaluations of the monetary worth" of real estate closely held by some of the officers and directors and transferred to their own company as part of the settlement and, ultimately, the merger. *GMC Fuel Tank Lit.*, 55 F.3d at 821. The lodestar rationale "has appeal where, as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." *Id.* *See also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993); *Shlensky v. Dorsey*, 574 F.2d 131, 150 (3d Cir.1978) (in a shareholders' derivative class action, the Court stated: "The district court's award of attorneys' fees, which is, otherwise, a matter within its discretion, is, therefore, subject to review to determine

whether the court adhered to the Lindy guidelines in arriving at the amount of the award); *Awarding Attorneys' Fees* at 57–58.

The lodestar method is most appropriate in the derivative action not only because it is the *only* method that is capable of reasonable precision given the difficulty in determining even an approximate value of the settlement, but also because it is the method best suited, in *this aspect* of the litigation, to fulfill this Court's fiduciary obligation to the class and to the court system to conduct "a thorough judicial review of fee applications ... in all class action settlements" to "police abuses ... alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding." *Id.* at 820. This concern is *heightened* in shareholders' derivative litigation:

> One of the risks flowing from shareholders' difficulty in monitoring derivative litigation is that plaintiffs' counsel and the defendants will structure a settlement such that the plaintiffs' attorneys' fees are disproportionate to any relief obtained for the corporation. Plaintiffs' attorneys and the defendants may settle in a manner adverse to the interests of the plaintiffs by exchanging a low settlement for high fees.

*Bell Atlantic Corp.*, 2 F.3d at 1310.

As the Court of Appeals for the First Circuit stated in *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991):

> Over a decade ago, we first spoke about the important nexus between judicial scrutiny and the avoidance of excessive or undeserved fee awards in the class action environment.... Since then, the fear that class actions will prove less beneficial to class members than to their attorneys has been often voiced by concerned courts, ... and periodically bolstered by empirical studies.... The problem has two aspects: *extortion* (that is, the prosecution of strike suits) and *collusion* (that is, the tension which necessarily arises between class members and class counsel when settle-

---

**10.** "Generously" because the Court did not discount the standing value of the real estate by any portion of the nearly $2 million in encumbrances on the property.

ments and attorneys' fees are negotiated simultaneously). While the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery, there is also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.... It is because of the *potential risk* that plaintiffs' attorneys and defendants will team up to further *parochial interests* at the expense of the class that the Rule 23(e) protocol employed by several circuits explicitly includes *scrutinizing settlements for indicia of collusion....*

(emphasis added).

The appearance of possible "collusion" in this case requires this Court to perform its judicial obligations by holding DPC to strict compliance with the *Lindy* lodestar method. As DPC point out "[i]t is noteworthy, that none of the defendants moved to dismiss the derivative complaint on any of the several grounds upon which such complaints are often vulnerable, including the lack of pre-litigation demand upon the Board of Directors of Chambers." Joint Declaration, ¶ 6. The Court agrees this is noteworthy because, although there *may* well have been legitimate reasons for not attempting to exploit derivative plaintiffs' vulnerabilities, the *appearance* of coziness and *potential* for collusion in this derivative action mandates close judicial scrutiny of DPC's application for attorneys' fees and strict adherence to the *Lindy* requirements as they have developed in the Third Circuit.

The "extortion" concern is amplified by DPC's inscrutable "Rule 59" Motion for Modification which had great potential to gum-up the entire $95 million settlement of the main class action and the merger with USA Waste, Inc., with almost no chance of gaining any legal victory on anything having to do with the "merits" of said motion. Although DPC assure us it was not their intention to threaten the appeal period and place the global settlement in *extreme* jeopardy, nevertheless, that was most assuredly the *certain* effect of that filing, under the plain, unambiguous Federal Rules of Appellate Procedure. Fed. R.A.P. Rule 4(a)(4). It is difficult to conceive how counsel as experienced with all the ins-and-outs and subtle nuances of securities litigation in the federal courts as are the primary DPC, *see, e.g., Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274 (3d Cir.1994), could have been unaware that a Rule 59 motion to alter or amend the judgment or a motion to amend findings of fact would necessarily extend the time to appeal. This *unusual* motion raises the spectre, therefore, that it was filed for strategic purposes to advance DPC's parochial interests, and not for the good of the derivative plaintiff class or the corporation. That ominous spectre is enough to warrant more scrupulous review of DPC's application for attorneys' fees than is warranted for CLC's in the main class action.

Therefore, the Court finds that the *unenhanced* lodestar method is the appropriate method of awarding reasonable attorneys' fees to DPC in the derivative action which produced some value to the global settlement, and an appropriate order will be entered referring DPC's attorneys' fee application to a special master to conduct evidentiary hearings, if the special master deems it necessary, to review the documents filed in support of the fee application, to calculate the amount to which DPC are entitled as *reasonable* counsel fees, and to make an appropriate recommendation to this Court.

The portion of the $2 million cash aspect of the derivative settlement which is not ultimately awarded to the DPC will be recaptured into the Distribution Fund, and will be awarded to the class members. Additional attorneys' fees to the main class action plaintiffs' counsel will not be awarded on the amount recaptured.

Appropriate Orders will be entered in accordance with this opinion.

### ORDER OF COURT

AND NOW, this 18th day of August, 1995, for the reasons set forth in the accompanying

opinion, it is hereby **ORDERED AS FOLLOWS:**

1. Plaintiffs' **Verified Joint Petition and Supporting Memorandum for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards** (Documents No. 283 and No. 284) is **GRANTED in part and REFERRED TO A SPECIAL MASTER in part;**

2. **IT IS FURTHER ORDERED** that the Court hereby awards attorneys' fees in an amount to be finally calculated by application of the declining percentage scale set forth in the accompanying opinion at 30% of the first $10 million, 25% of the second $10 million, and 20% of all recoveries in excess of $20 million (not including amounts recaptured from the derivative action settlement), of the Distribution Fund, which shall be deducted from the Distribution Fund in the manner provided in the settlement agreement;

3. **IT IS FURTHER ORDERED,** pursuant to Rule 1 and Rule 53 of the Federal Rules of Civil Procedure, this Court hereby refers Co–Lead Counsel's ("CLC's") Application for Reimbursement of Expenses (Documents No. 283 and 284) to John J. McLean, Jr., Esquire, who is appointed Special Master for the purpose of making findings of fact, conclusions of law and a recommendation as to the expenses reasonable and necessary to this litigation to be reimbursed to plaintiffs' counsel.

4. The Special Master shall have only the rights, powers and duties set forth herein, and those provided in Rule 53 of the Federal Rules of Civil Procedure.

5. The Special Master, in fulfillment of his duty to recommend reimbursement of expenses, may hold conferences pursuant to Fed.R.Civ.P. 16(a) and establish such other procedures as he feels are reasonably necessary. He may engage in *ex parte* communications with parties. Such communications may be made with the attorney representing a party, or directly with the party upon permission of that party's attorney.

6. The Special Master may also communicate with the Court verbally, or by telephone, and may, in communications with the Court, divulge confidential information related to him by the parties, which confidences shall be preserved by the Court.

7. The Special Master shall be compensated for his services at the rate of $225 per hour, together with all reasonable and necessary expenses incurred by him in connection with the performance of his duties, which shall be paid from the Distribution Fund as directed by the Court pursuant to Fed. R.Civ.P. Rule 53(a).

8. Thereafter, this Court shall enter an order adopting, modifying or rejecting the recommendation and report of the Special Master, with or without further proceedings as this Court deems necessary or advisable. Fed.R.Civ.P. Rule 53(e)(2).

9. **IT IS FURTHER ORDERED** that

(i) CLC shall file with the Court within ten days of this Court's approval of Special Master's recommendation of expenses or final award modifying said recommendation, a Tentative Schedule of Allocation and Distribution of Attorneys' Fees and Expenses listing all law firms or attorneys who will share in this award and the amount to be received by each. CLC shall serve all plaintiffs' counsel with copies of this Tentative Schedule by hand delivery, facsimile or overnight delivery;

(ii) if there are any objections to said Tentative Schedule, each objector shall consult and confer with CLC within 10 days of its filing in an attempt to resolve the dispute;

(iii) if counsel are unable to resolve any such objections, each objector shall file with the Court his or her Objections to Tentative Schedule of Allocation and Distribution of Attorneys' Fees and Expenses within 30 days of its filing, and shall serve copies upon all plaintiffs' counsel in the manner described in ¶ 9(i);

(iv) the Court shall thereafter consider and resolve any differences, or refer any remaining attorneys' fees disputes to the Special Master pursuant to Fed.R.C.P. Rule 53.

10. **IT IS FURTHER ORDERED** that incentive awards of $2,500 shall be paid from the Distribution Fund to each of the class representatives in the manner provided in the settlement agreement.

11. On or before August 25, 1995, at least one of the CLC shall file with the Court a verified statement declaring whether there have been any side agreements, understandings or arrangements, oral or written, between any of the main class action plaintiffs' counsel and derivative plaintiffs' counsel regarding the payment or allocation of attorneys' fees, and if so, shall set forth the elements and particulars of said side agreements, understandings or arrangements; any such written agreements, understandings or arrangements shall be attached to the verified statement. (*See* Manual for Complex Litigation (Third) at § 23.23).

12. CLC shall serve all parties of record with copies of this order and the accompanying opinion as provided in Pretrial Order No. 2.

### ORDER OF COURT

AND NOW, this 18th day of August, 1995, for the reasons set forth in the accompanying opinion, it is hereby **ORDERED AS FOLLOWS:**

1. **Derivative Plaintiffs' Motion for Modification, Or, In the Alternative, for Reargument, Reconsideration and/or Clarification of the Court's May 30, 1995 Order** (Document No. 29) is **DENIED;**

2. **IT IS FURTHER ORDERED,** pursuant to Rules 1, 53 and 54(d)(2)(D) of the Federal Rules of Civil Procedure, this Court hereby refers derivative plaintiffs' counsel's application for attorneys' fees and expenses (Document No. 20) to John J. McLean, Jr., Esquire, who is appointed Special Master for the purpose of making findings of fact and conclusions of law, and a recommendation as to the appropriate, unenhanced lodestar calculation of attorneys' fees and expenses for the work reasonably performed by derivative plaintiffs' counsel in settlement of this derivative action, in accordance with the principles set forth in the Manual for Complex Litigation, (Third), the October 8, 1985, Report of the Third Circuit Task Force on Court Awarded Attorneys' Fees, 108 F.R.D. 237 (1985), and controlling decisions of the United States Court of Appeals for the Third Circuit applying and refining the lodestar analysis adopted in *Lindy Bros. Builders,*

*Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), *appeal following remand,* 540 F.2d 102 (3d Cir.1976). The Special Master's recommendation shall include a proposed schedule of distribution among participating derivative plaintiffs' counsel.

3. Within ten days of being served with notice of the filing of the report, each attorney or party objecting to the Special Master's recommendation regarding the aggregate lodestar and expense calculation or any individual components thereof, or to his recommended schedule of distribution, shall file and serve Objections to Special Master's Recommendation Regarding Attorneys' Fees, with memorandum in support not to exceed 15 pages, in accordance with Fed. R.Civ.P. Rule 53(e)(2). Any party or attorney may file a Memorandum in Opposition to any such Objections to Special Master's Recommendation, not to exceed 15 pages, within ten days of being served with such objections.

4. The Special Master shall have only the rights, powers and duties set forth herein, and those provided in Rules 53 and 54 of the Federal Rules of Civil Procedure.

5. The Special Master, in fulfillment of his duty to recommend attorneys' fees and expenses, may hold conferences pursuant to FRCP 16(a) and establish such other procedures as he feels are reasonably necessary. He may engage in *ex parte* communications with parties. Such communications may be made with the attorney representing a party, or directly with the party upon permission of that party's attorney.

6. The Special Master may also communicate with the Court verbally, or by telephone, and may, in communications with the Court, divulge confidential information related to him by the parties, which confidences shall be preserved by the Court.

7. The Special Master shall be compensated for his services at the rate of $225 per hour, together with all reasonable and necessary expenses incurred by him in connection with the performance of his duties, which shall be paid as directed by the Court pursuant to Fed.R.Civ.P. Rule 53(a).

8. The Special Master shall serve a copy of his written reports and recommendation

on derivative plaintiffs' counsel, who shall immediately serve copies of same on all other counsel of record in the derivative action and upon co-lead counsel in the main class action (Civil Action No. 92–0679) by hand delivery, facsimile or overnight delivery.

9. Thereafter, this Court shall enter an order adopting, modifying or rejecting the recommendation and report of the Special Master, with or without further proceedings as this Court deems necessary or advisable. Fed.R.Civ.P. Rule 53(e)(2).

10. On or before August 25, 1995, at least one of the derivative plaintiffs' counsel shall file with the Court a verified statement declaring whether there have been any side agreements, understandings or arrangements, oral or written, between any plaintiffs' counsel in the main class action and derivative plaintiffs' counsel regarding the payment or allocation of attorneys' fees, and if so, shall set forth the elements and particulars of said side agreements, understandings or arrangements; any such written agreements, understandings or arrangements shall be attached to the verified statement. (*See* Manual for Complex Litigation (Third) at § 23.23.)